1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Larry Boecken, Jr., | 1:05-cv-00090-OWW-DLB |
| Plaintiff, | ORDER GRANTING DEFENDANT'S |
| v. | MOTION FOR SUMMARY JUDGMENT (Doc. 23) AND DENYING |
| Gallo Glass Company, | PLAINTIFF'S MOTION FOR |
| Defendant. | SUMMARY JUDGMENT (Docs. 24, 28, & 29) |

I.   Introduction.

This case concerns the termination of plaintiff Larry Boecken's ("Boecken") employment with defendant Gallo Glass Company ("Gallo"). Before the court for decision are cross-motions for summary judgment. Boecken moves for summary judgment on his claims that: (1) he was terminated for his proper use of Family Medical Leave Act ("FMLA") leave in violation of FMLA and the California Family Rights Act ("CFRA");[1] (2) he was actually terminated for his perceived sexual orientation in violation of California's Fair Employment and Housing Act ("FEHA"); and (3) that he was terminated in violation of public policy. Gallo moves for summary judgment on the grounds that (1) Gallo properly terminated Boecken for misuse of his FMLA leave; (2) Boecken's

_____

[1] As an alternative to his summary judgment motion, Boecken moves for summary adjudication of Gallo's "affirmative defense" that it operated under a good faith belief that Boecken improperly used FMLA leave.

1 sexual orientation played no part in his termination; and (3)

2 Boecken's Public Policy claim is subsumed within his FMLA/CFRA

3 and FEHA claims.

4

5                          II.  **Background**.

6        A.   **Procedural Background**.

7        Boecken filed his complaint for damages against Gallo in

8 Stanislaus County Superior Court on November 18, 2004.   The

9 complaint alleged:   (1) violation of the FMLA and CFRA,

10 (2) perceived sexual orientation discrimination under FEHA, and

11 (3) termination in violation of public policy.   On January 21,

12 2005, Gallo removed the case to the United States District Court

13 for the Eastern District of California, Fresno Division, claiming

14 federal question jurisdiction.   On February 1, 2005, Gallo filed

15 an answer to Boecken's complaint, which included eleven

16 affirmative defenses.   On September 25, 2006, the parties filed

17 cross-motions for summary judgment, including more than 100 pages

18 of evidentiary objections.[2]   Oral argument was heard September

19 10, 2007.

20

21        B.   **Factual Background**.

22        Boecken worked at Gallo from 1997 until November 18, 2003.

23 Boecken's grandmother ("grandmother") was approximately 90 years

24 old in October 2002.   Boecken's grandmother raised him, and

25 Boecken continued to live with her throughout all relevant time

26

27        [2]     These objections are resolved in a separate,

28 concurrently-filed memorandum decision.

                                2

periods.  Because of his grandmother's age and deteriorating
health, Boecken tended to her various needs when others could
not.  Boecken was also his grandmother's primary caretaker.

In October 2002, his grandmother's physician, Dr. Davidson,
suggested that Boecken take FMLA leave to care for her.  Boecken
spoke with Sandra Duvall ("Duvall"), a human resources clerk at
Gallo, who gave him the necessary forms.  Duvall also claims that
she advised Boecken that FMLA leave time was limited to the time
certified by the physician, and for the purpose of caring for the
individual under the circumstances certified by the physician.
Boecken disputes that Duvall gave him this advice, asserting that
she only distributed the forms to him.

Boecken obtained the required medical certification
regarding his grandmother's condition from Dr. Davidson in early
October 2002, and Boecken submitted the certification to Gallo's
human resource department as instructed.  The certification
stated that Boecken's grandmother's physical health was in
serious decline.  In the certification, Boecken stated:

> I am the sole caregiver for my grandmother who lives with
> me and who will be 90 years of age in June.  She has
> sustained several heart attacks resulting in chronic
> heart disease.  Naturally, she is frail not only from her
> medical condition, but also her age.  At late, my
> grandmother has worsened episodes with her heart that
> strickens [sic] her to her bed for several days at a time
> requiring constant care and other less severe episodes
> requiring less care.  Requested FMLA will include both
> partial and full days of absence.

Gallo communicated its approval of the FMLA leave request to
Boecken in writing on October 24, 2002.  Boecken maintains that
his FMLA leave request, and therefore its approval, was for
"intermittent leave" that would enable him to reduce his normal

3

1  work day from twelve hours to eight hours.  Boecken asserts that

2  he opted for this schedule so that he would have enough time and

3  energy to provide for his grandmother's needs, including shopping

4  and preparation of meals.  Gallo disagrees with Boecken's

5  characterization of the leave approval, asserting that the FMLA

6  certification stated it would be necessary for Boecken to take

7  intermittent leave, estimated three days every four to six weeks,

8  but said nothing about a regular reduced work schedule.  Gallo

9  points out that Boecken's actual leave requests, described below,

10  are consistent with its interpretation of the leave approval.

11       Any Gallo employee who requested FMLA leave in 2002 was

12  provided a "packet" of information, which included (1) "Notice of

13  Associate Rights and Responsibilities Under Family Care and

14  Medical Leave (FMLA/CFRA) and Pregnancy Disability Leave," (2)

15  "Certification of Health Care Provider," and (3) "Acknowledgment

16  of Receipt."  April Tharpe ("Tharpe"), Gallo's human resource

17  coordinator, signed the Acknowledgment, indicating that she

18  provided Boecken with the "packet" of information.  Boecken

19  signed the Acknowledgment of Receipt for the FMLA "packet" on

20  September 3, 2002.  Additionally, during the years Gallo employed

21  Boecken, the company displayed in the workplace a poster titled

22  "Your Rights Under The Family and Medical Leave Act of 1993."

23  Gallo also posted its FMLA/CFRA policies in a location accessible

24  by all employees.

25       In October 2003, Boecken's Grandmother needed additional

26  care, as her health had intermittently worsened.  On Monday,

27  October 27, 2003, Boecken requested four hours of FMLA leave for

28  that day, starting at 2:00 p.m.  On Tuesday, October 28, 2003,

**4**

1   Boecken requested additional FMLA leave for four hours that day
2   and for four hours the following day, again starting at 2:00 p.m.
3   Boecken was scheduled to work until 6:00 p.m. on all three days.
4   Gallo approved Boecken's FMLA leave request.

5       Tharpe advised Jorian Reed ("Reed"), Gallo's human resources
6   manager, that she was suspicious of Boecken's leave request for
7   October 27, which happened to be the same time Boecken's friend
8   and co-worker, Corey Sweetin ("Sweetin") was leaving work during
9   a temporary training week.  When Boecken later told Tharpe he was
10  going to take FMLA leave at 2:00 p.m. on October 28 and 29 as
11  well, she again reported similar suspicions to Reed.  Tharpe
12  specifically asked Boecken why he needed the time off.  Boecken
13  responded that his niece was unable to care for his grandmother
14  that week, and that there was nobody but himself to care for her.
15  Tharpe did not explain her suspicions to Boecken.

16      Acting on Tharpe's suspicions, Reed authorized surveillance
17  of Boecken.  Reed made a surveillance request to E. & J. Gallo
18  Winery security manager Mark Swaim ("Swaim").  Reed informed
19  Swaim that Boecken was possibly misusing FMLA leave and provided
20  Swaim with a description of Boecken.  Reed further advised Swaim
21  that Boecken was supposed to be taking care of his grandmother
22  who lived with him.  Reed requested surveillance only during work
23  hours, and he did not suggest what conduct raised suspicions
24  about Boecken's potential abuse of FMLA leave.

25      Approximately one week after Reed requested surveillance of
26  Boecken, Gallo received the surveillance report ("Report").  The
27  Report disclosed that Boecken did not go directly home from work
28  to care for his grandmother on October 28 or 29.  Instead, on

1   October 28, Boecken drove to a public park, parked his car,

2   walked in the park, stood by the restroom, drove around the park,

3   parked again, walked around again, walked back into some bushes,

4   came out of the bushes, and entered his car and left the

5   park and drove to a hardware store.  After Boecken left the

6   hardware store, he drove to another store and then drove off.

7   These activities ran from 2:02 p.m. to 3:00 p.m.  The

8   investigator then attempted to find out whether Boecken had

9   returned home, but could not locate his car in the area near his

10  home as of 4:00 p.m.  Boecken admitted in a deposition that he

11  would have arrived home at approximately 3:45 p.m. to 3:55 p.m.

12  on October 28.

13      According to the Report, the following day, October 29,

14  Boecken again left work at 2:00 p.m.  He left the building

15  accompanied by another man.  They each got into their respective

16  cars and the other man followed Boecken to Tuolumne Regional

17  Park.  They parked, stopped briefly, and then drove off the

18  pavement to a dirt area and parked.  Both men got out of their

19  cars and walked into the woods together.  At this point they

20  became aware of the investigator and left.  They went back to

21  their cars and drove away.  The investigator reported that a few

22  minutes later he saw Boecken's car parked in a rear parking lot

23  at the same park.  About half an hour later, Boecken walked up to

24  his car and left.  Shortly before 3:00 p.m., he ran a red light

25  and the investigator lost contact.  The investigator again went

26  to Boecken's home and did not observe his car parked there at any

27  time through 6:02 p.m.  The investigator confirmed that Boecken

28  was not at home as of 3:55 p.m.  Boecken admitted in a deposition

1  that he did not return home until approximately 4:30 p.m. that
2  workday.

3       Reed reviewed the report and the videotapes from Tuesday,
4  October 28, and Wednesday, October 29.  Reed confirmed that it
5  was Boecken on the tape and that the other man with him on
6  Wednesday was Boecken's co-worker, Sweetin.  Based on the
7  investigative report and videotape, Boecken's FMLA certification,
8  and the statements he made to Tharpe about the need to be at home
9  to care for his grandmother, Reed and his supervisor, Lisa Bates
10 ("Bates"), concluded that Boecken had misused his FMLA leave
11 because he did not provide direct care to his grandmother during
12 the time he took off under FMLA.  Gallo asserts their conclusion
13 was based solely on information that Boecken had not gone home to
14 care for his grandmother.

15      Reed and Bates interviewed Boecken to get his side of the
16 story.  During this interview, Boecken stated that he visited the
17 park to relieve his own stress and admitted that he provided no
18 care to his grandmother while in the park.[3]  Following the
19 investigative interview, Bates and Reed determined that Boecken
20 misused his FMLA leave and that immediate termination was
21 appropriate.  They informed Boecken of the basis for his
22 termination.

23

24      [3]  This interview was informally recorded in notes taken
25 by Mr. Reed and later attached to Boecken's employment file.
   Boecken successfully objected to the admission of these notes on
26 the grounds that no foundation was laid for their admission under
   any exception to the hearsay rule.  However, the essential
27 substance of the interview is also reflected in Mr. Reed's
   deposition testimony.  *See* Reed Depo. Excerpts, Doc. 23-9, at 56-
28 57.

1    Boecken explains some of his activities on the dates in

2   question as follows.  His post-work routine regularly included a

3   medium length walk in the park near work of 15-50 minutes to

4   maintain his physical and mental health.  Boecken asserts that he

5   needed these walks to unwind and de-stress from work before he

6   went home to provide additional care for the physical and

7   psychological needs of his grandmother.  On the way home, Boecken

8   frequently needed to run errands for his grandmother that

9   included shopping and obtaining materials for household repairs.

10    On both October 28 and 29, Boecken asserts that he ran a few

11   errands on his grandmother's behalf for things that needed to be

12   done for her care.  These errands included going to a hardware

13   store and Home Depot for a hand-railing and Smart and Final, for

14   a case of Ensure, a dietary supplement.  On October 28, Boecken

15   left work at 2:00 p.m. and went for a short walk before he went

16   home to care for his grandmother.  On October 29, Boecken met his

17   friend Sweetin at the park and went for a short walk.  Boecken

18   claims he did not "loiter" or engage in homosexual activity while

19   in the park.  After both going to the park, and running necessary

20   errands, he drove home.  When he got home on October 27, 28 and

21   29, he continued to give care to his grandmother, including

22   preparing meals, helping her get around, and providing

23   psychological comfort.

24    Boecken also maintains that Gallo's investigator was

25   positioned so that he could observe the front entrance, but not

26   the back entrance, to Boecken's house.  Boecken asserts that he

27   arrived home and entered through the rear of the house on the

28   occasions in question.  No one ever knocked on Boecken's door or

**8**

1  called him to see if he was there.

2      After the weekend, Boecken received a call from Gallo
3  requesting a meeting regarding his FMLA leave and possible fraud.
4  At the meeting, he was questioned about his actions and was shown
5  the video tape.  He was also shown the Report, which, according
6  to Boecken, suggests that rather than taking care of his
7  grandmother, Boecken and Sweetin were engaged in homosexual
8  sexual acts.

9      Boecken asserts that there was a rumor around the plant that
10 he and Sweetin were engaged in a homosexual relationship.
11 Boecken himself never heard anyone at Gallo make any negative or
12 derogatory comments about his sexuality or homosexuals in
13 general.  Tharpe admits that she overheard an offhand comment by
14 two other Gallo employees who suggested with "a wink and a nod"
15 that Boecken and Sweetin were "hanging out a lot together."
16 Tharpe maintains that she ignored the comment and there is no
17 evidence that she passed it along to others within HR.  Gallo
18 maintains that no one involved in the decisions to investigate
19 and terminate Boecken, namely Bates and Reed, knew then or knows
20 now whether or not he is homosexual.

21     Boecken met with union representative David Hoffman and Reed
22 on November 18, 2003.  Gallo terminated Boecken based on the
23 investigator's reports and video tape.

24

25                    III.  Legal Standard.

26     Summary judgment is warranted only "if the pleadings,
27 depositions, answers to interrogatories, and admissions on file,
28 together with the affidavits, if any, show that there is no

                              9

1  genuine issue as to any material fact."  Fed. R. Civ. P. 56(c);

2  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

3  Therefore, to defeat a motion for summary judgment, the

4  non-moving party must show (1) that a genuine factual issue

5  exists and (2) that this factual issue is material.  *Id.*  A

6  genuine issue of fact exists when the non-moving party produces

7  evidence on which a reasonable trier of fact could find in its

8  favor viewing the record as a whole in light of the evidentiary

9  burden the law places on that party.  *See Triton Energy Corp. v.*

10  *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also*

11  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).

12  Facts are "material" if they "might affect the outcome of the

13  suit under the governing law."  *Campbell*, 138 F.3d at 782

14  (quoting *Anderson*, 477 U.S. at 248).

15      The nonmoving party cannot simply rest on its allegations

16  without any significant probative evidence tending to support the

17  complaint.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

18  2001).

19      [T]he plain language of Rule 56(c) mandates the entry
        of summary judgment, after adequate time for discovery
20      and upon motion, against a party who fails to make a
        showing sufficient to establish the existence of an
21      element essential to the party's case, and on which
        that party will bear the burden of proof at trial.  In
22      such a situation, there can be "no genuine issue as to
        any material fact," since a complete failure of proof
23      concerning an essential element of the nonmoving
        party's case necessarily renders all other facts
24      immaterial.

25  *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more

26  implausible the claim or defense asserted by the nonmoving party,

27  the more persuasive its evidence must be to avoid summary

28  judgment.  *See United States ex rel. Anderson v. N. Telecom,*

1    *Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the

2    evidence must be viewed in a light most favorable to the

3    nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on

4    summary judgment is not to weigh evidence or resolve issues;

5    rather, it is to determine whether there is a genuine issue for

6    trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th

7    Cir. 1996).

8

9                   IV.  <u>Discussion</u>.

10       A.  <u>FMLA and CFRA</u>.

11         1.  <u>Overview of FMLA and CFRA</u>.

12       The purpose of the FMLA is "to balance the demands of the

13    workplace with the needs of families[;]...to entitle employees to

14    take reasonable leave for medical reasons..., and for the care of

15    a child, spouse, or parent who has a serious health condition;

16    and to accomplish [these] purposes...in a manner that

17    accommodates the legitimate interests of employers...."  29

18    U.S.C. § 2601(b).  "The enactment of FMLA was predicated on two

19    fundamental concerns -- the needs of the American workforce, and

20    the development of high-performance organizations."  29 C.F.R.

21    § 825.101(b).  "The FMLA is both intended and expected to benefit

22    employers as well as their employees."  *Id.* § 825.101(c).

23       The FMLA provides "an eligible employee shall be entitled to

24    a total of 12 workweeks of leave during any 12-month period for

25    one or more of the following...[i]n order to care for the spouse,

26    or a son, daughter, or parent, of the employee, if such spouse,

27    son, daughter, or parent has a serious health condition."  29

28    U.S.C. § 2612(a)(1)(C).

1    Providing care to a family member encompasses both physical
2    and psychological care, and "includes situations where, for
3    example, because of a serious health condition, the family member
4    is unable to care for his or her own basic medical, hygienic, or
5    nutritional needs or safety, or is unable to transport himself or
6    herself to the doctor, etc." 29 C.F.R. § 825.116(a).  It also
7    includes "providing psychological comfort and reassurance which
8    would be beneficial to a child, spouse or parent with a serious
9    health condition who is receiving inpatient or home care."  *Id*.

10    An employee who takes leave under the FMLA is entitled to be
11    restored to the position held when the leave commenced, or to be
12    restored to an equivalent position with equivalent benefits, pay,
13    and other terms and conditions of employment.  29 U.S.C. §
14    2614(a).

15    The FMLA prohibits employers from interfering with an
16    employee's exercise of FMLA rights.  It is "unlawful for any
17    employer to interfere with, restrain, or deny the exercise of or
18    the attempt to exercise, any right provided under [the FMLA]."
19    29 U.S.C. § 2615(a)(1).  The regulations interpret "interference"
20    to include refusing the authorization of FMLA leave, discouraging
21    use of FMLA leave, and using the taking of FMLA leave as a
22    negative factor in employment actions.  29 C.F.R. § 825.220(a-b).
23    It is also "unlawful for any employer to discharge or in any
24    other manner discriminate against any individual for opposing any
25    practice made unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(2).
26    The FMLA permits an employee to file a civil action against his
27    or her employer if the employer interferes with the employee's
28    FMLA rights.  § 2617(a)(1).

CFRA parallels the FMLA with the shared purpose of balancing the demands of the workplace with the needs of families, and to promote stability and economic security. *See Nelson v. United Technologies*, 74 Cal. App. 4th 597, 611 (1999). Because the CFRA is substantially identical to the FMLA, California courts routinely rely on federal cases when reviewing CFRA. *See Dudley v. Department of Transp.*, 90 Cal. App. 4th 255, 261 (2001).

### 2. Summary of Parties' Arguments.

Boecken argues Gallo interfered with his FMLA and CFRA rights by not restoring him to his previous position after he took FMLA leave in late October 2003 and by providing inadequate notification of its FMLA leave policies. Boecken also maintains that Gallo retaliated against him for exercising his FMLA rights by using misuse of FMLA leave as a pretext to terminate him. Gallo maintains Boecken's FMLA claims have no merit. Specifically, that Boecken's trips to the park were not a protected activity under the FMLA, and that Boecken's notice claim should fail because Gallo satisfied its general duty to give Boecken notice of his FMLA rights and has no separate duty to specifically explain that he had to use his FMLA leave to care for his grandmother. Finally, Gallo asserts it did not retaliate against Boecken because he used FMLA leave.

### 3. FMLA Analysis.

#### a. Interference Claim.

Under FMLA, both Boecken's claim that Gallo violated FMLA by terminating him and his claim that Gallo retaliated against him for exercising his FMLA rights are treated as claims for "interference" under 29 U.S.C. § 2615(a)(1). *Bachelder v. Am.*

13

1  *West Airlines*, *Inc.*, 259 F.3d 1112, 1124-25 (9th Cir. 2002).

2  Unlike claims for unlawful termination brought under many federal

3  civil rights statutes, FMLA interference claims are not analyzed

4  under the traditional *McDonnell Douglas* burden shifting approach.

5  Instead, the court must simply answer a threshold question:  Was

6  the employee engaging in covered conduct during FMLA leave.  If

7  so, the employer acts unlawfully if it terminates the employee

8  for taking FMLA leave.  *Id*. at 1125.

9       Gallo takes the position that Boecken cannot prevail on his

10  FMLA claim because he was not at home caring for his grandmother

11  on October 28 and 29.  It is undisputed that Boecken did not

12  immediately return home at 2:00 p.m. to directly care for his

13  grandmother.  He spent some time in the park (the nature of that

14  time spent is not relevant, as it is undisputed that he was not

15  providing care to his grandmother either directly or indirectly

16  while in the park).  It is also undisputed that he spent some of

17  the time between 2:00 p.m. and 4:00 p.m. on the days in question

18  running errands, although it is disputed whether he was shopping

19  for household necessities and other items needed by his

20  grandmother.  It is also disputed when he arrived at home on the

21  days in question.  The investigator reported that he did not see

22  anyone enter the house before 6:00 p.m., while Boecken maintains

23  he entered the home through the back door before 6:00 p.m..

24       The key question is whether Boecken's conduct constitutes

25  "caring for" his grandmother as that term is defined by the

26  statute.  FMLA does not define the phrase "to care for."

27  However, the Department of Labor regulations discuss what it

28  means when an employee is "needed to care for" a family member:

1
2
3
4
5
6
7

        **(a) The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.**

8
9
10

        **(b) The term also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care, such as transfer to a nursing home.**

11
12
13
14

        **(c) An employee's intermittent leave or a reduced leave schedule necessary to care for a family member includes not only a situation where the family member's condition itself is intermittent, but also where the employee is only needed intermittently--such as where other care is normally available, or care responsibilities are shared with another member of the family or a third party.**

15   **29 C.F.R. § 825.116(a).  The legislative history of the FMLA**

16   **provides additional interpretive guidance:**

17
18
19
20
21

        **The phrase "to care for" ... is intended to be read broadly to include both physical and psychological care. Parents provide far greater psychological comfort and reassurance to a seriously ill child than others not so closely tied to the child. In some cases there is no one other than the child's parents to care for the child. The same is often true for adults caring for the seriously ill parent or spouse.**

22   **S. Rep. No. 103-3, at 24 (1993), reprinted in 1993 U.S.C.C.A.N.**

23   **at 26.**

24        **The Ninth Circuit has noted that "the [] regulations list**

25   **examples of situations in which an employee may 'care for' a**

26   **family member, but the list by its terms is not all-inclusive. In**

27   **addition to introducing the 'situations' by the phrase 'for**

28   **example,' the listing ends with 'etc.,' signifying that other**

1  types of activities are contemplated." *Scamihorn v. Gen. Truck*
2  *Drivers*, 282 F.3d 1078, 1087 (9th Cir. 2002).

3       The caselaw sheds some light on the lawfulness of running
4  errands on behalf of the person for whom one is caring.  In
5  *Scamihorn*, a truck driver took FMLA leave from his job to move to
6  another city to care for his father, who was suffering from
7  depression following the death of a Scamihorn's sister.  *Id*. at
8  1080-81.  While residing with his father, Scamihorn talked with
9  his father about his sister, performed various chores around the
10 house, including shoveling snow, chopping firewood, and clearing
11 the yard, and drove his father to counseling sessions on several
12 occasions.  Upon returning to his job, Scamihorn was not
13 reinstated to his position.  *Id*.

14      The district court granted summary judgment for the
15 employer, concluding that Scamihorn's father was able to care for
16 his own basic needs and, as a result, Scamihorn's actions were
17 not covered by FMLA.  The Ninth Circuit reversed, concluding that
18 Scamihorn raised a genuine issue regarding whether his activities
19 were necessary, "because his father was at times unable to care
20 for some of his own basic needs."  The Ninth Circuit reasoned:

21                    The percentage of adults in the care of their
                      working children or parents due to physical and
22                    mental disabilities is growing. Because removing
                      people from a home environment has been shown to
23                    be costly and often detrimental to the health and
                      well-being of persons with mental and physical
24                    disabilities there is a trend away from
                      institutionalization. While preferable,
25                    independent living situations can result in
                      increased care responsibilities for family
26                    members, who by necessity are also wage earners.
                      Home care, while laudable, can also add to the
27                    tension between work demands and family needs.

28

                                  16

1

2          S. Rep. No. 103-3, at 6 (1993), reprinted in 1993
           U.S.C.C.A.N. at 8-9. Scamihorn experienced first-hand
3          the tension between his job and his father's
           psychological well-being. The purpose of the FMLA is to
           relieve some of this tension by giving employees time
           off without pay to care for relatives who suffer from
4          serious health conditions.

5          Admittedly, there are gaps and uncertainties in the
           record here that suggest Scamihorn may be unable
6          ultimately to prove that he meets the criteria
           established by the Department of Labor regulations. For
7          instance, it appears that because Joseph Sr. worked in
           the Veterans Medical Center, he was able to obtain
8          treatment without officially taking time off from work
           and completing insurance and other medical forms to
9          document and authorize the treatment. He also was able
           to work from home and thereby avoid taking sick leave
10         when he felt too depressed to go to his office. The
           mere lack of formalities alone, however, would not
11         justify the exclusion of FMLA coverage here. Viewing
           the evidence in the light most favorable to Scamihorn,
12         as we must, we conclude that he set forth sufficient
           evidence to create genuine issues of disputed material
13         fact to be resolved in a trial.

14  *Scamihorn*, 282 F.3d at 1088.  In response to the employer's

15  objection that "caring for" should involve some level of

16  participation in ongoing treatment, the Ninth Circuit responded:

17         Scamihorn does not claim to have personally attended
           any of [his father]'s counseling sessions..., but he
18         participated in the treatment through both his daily
           conversations with his father about [his sister] and
19         the grief associated with her death and his constant
           presence in his father's life. Both [of his father's
20         Doctors] emphasized this fact.

21  *Id*. at 1088.

22      In contrast, in *Tellis v. Alaska Airlines*, 414 F.3d 1045

23  (9th Cir. 2005), the Ninth Circuit affirmed the grant of summary

24  judgment to an employer where the employee took FMLA leave to

25  care for his pregnant wife but then took a four day trip to

26  retrieve the family's car from another location, ostensibly to

27  reassure his wife.  The Ninth Circuit reviewed Scamihorn and

28  several other cases from other jurisdictions, concluding that a

                                    17

1  particular activity constitutes "caring for" a family member

2  under the FMLA only when the employee has been in close and

3  continuing proximity to the ill family member.  Id. at 1047

4  (citing *Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 77

5  & n. 13 (D. Me. 2002) (denying employer's summary judgment motion

6  when son spent "the entire day providing care and comfort to his

7  critically ill father"); *Briones v. Genuine Parts Co.*, 225 F.

8  Supp. 2d 711, 715-16 (E.D. La. 2002) (denying employer's summary

9  judgment motion when employee took leave to care for his three

10 healthy children while his wife cared for his hospitalized fourth

11 child).  The Ninth Circuit also examined a state court decision,

12 *Pang v. Beverly Hospital, Inc.*, 79 Cal. App. 4th 986 (2000), in

13 which the California Court of Appeal held an employee was not

14 protected under the CFRA.  The employee took leave to help her

15 ailing mother move from her two-story home to a one-level

16 apartment to minimize the need for at-home assistance.  The *Pang*

17 court stated:

18         Pang's admissions make clear that she was not there to

19         directly, or even indirectly, provide or participate in
        medical care for her mother. Instead, she was there to

20         help pack her mother's belongings and tell the movers
        where to place her mother's furniture. While Pang's

21         presence may have provided her mother some degree of
        psychological comfort, this was merely a collateral

22         benefit of activities not encompassed by the
        Commission's regulations.

23 *Id.* at 996.

24     The *Tellis* court concluded that these out-of-circuit

25 decisions supported its conclusion that "Tellis's activities

26 cannot be considered 'caring for' his wife."

27         Instead of participating in his wife's ongoing
        treatment by staying with her, he left her for almost

28         four days. Tellis claims his trip provided

1
2
3
4
5
6
7
8
9

psychological reassurance to his wife, but he did not
travel to Atlanta to participate in his wife's medical
care. Having a working vehicle may have provided
psychological reassurance; however, that was merely an
indirect benefit of an otherwise unprotected
activity--traveling away from the person needing care.
Tellis also claims his phone calls provided moral
support and comfort, but his phone calls during his
trip did not constitute participation in ongoing
treatment. <u>Common sense suggests that the phone calls
Tellis made do not fall within the scope of the FMLA's
care for" requirement</u>. The language of the decisions
supra makes this clear: the Scamihorn court relied on
the son's "daily conversations" and "constant
presence." 282 F.3d at 1088. Brunelle relied on the
son's spending the "entire day" with his father. 225
F.Supp.2d at 77 n. 13.

10
11
12
13

For the foregoing reasons, we hold that Tellis's
cross-country trip to retrieve the family car, and
phone calls to his wife while he was away, cannot as a
matter of law be considered "caring for" his wife under
the FMLA. Consequently, his absence from employment
during that period was not protected by the FMLA.

14

*Id*. at 1047 (emphasis added).[4]

15
16
17
18
19
20
21
22
23

In terms of the errands Boecken claims he ran for his
grandmother on the days in question, his conduct lies somewhere
between that of Scamihorn and Tellis.  Unlike Tellis, He claims
to have performed errands close to home.  However, unlike
Scamihorn, Boecken was not performing chores at the home in close
proximity to the individual for whom he was caring.  On the
record presently before the court, it cannot be determined as a
matter of law whether Boecken's errand-running was an activity
covered by FMLA.

24
25
26
27
28

[4]    Gallo also cites an unpublished decision, *Overlay v.
Covenant Transp., Inc.*, 178 Fed. Appx. 488, 494-95 (6th Cir.
2006), in which the Sixth Circuit determined an employer did not
violate FMLA for terminating a mother for taking one day off to
run errands for her disabled daughter because the errands were
either "not time sensitive" or were merely "routine activities"
like picking up laundry.

1       The caselaw sheds less light on the lawfulness of Boecken's
2  walks in the park.  Plaintiff cites a district court decision,
3  *Jennings v. Mid-Am. Energy Co.*, 282 F. Supp. 2d 954, 961-62 (S.D.
4  Iowa 2003), in which an employee was certified for FMLA for her
5  own serious health condition (rheumatoid arthritis).  When her
6  employer learned she had used some of her FMLA leave time to go
7  shopping, she was terminated.  The district court refused to
8  enter summary judgment for the employer, reasoning that an
9  employee with a serious health condition might be "unable to
10 perform the essential functions of her job...but capable of
11 stopping at a store to purchase one item on her way home."  *Id*.
12 at 961.  The *Jennings* court further reasoned:  "The FMLA contains
13 no requirement that an individual on intermittent medical leave
14 must immediately return home, shut the blinds, and emerge only
15 when prepared to return to work.  Such a rule would be both
16 unreasonable and impossible."  *Id*. at 961-96.

17      Plaintiff asserts that *Jennings* stands for the proposition
18 that he had no obligation to immediately return home to care for
19 his grandmother.  But, Jennings is distinguishable in one
20 important respect.  *Jennings* concerned someone who was taking
21 FMLA leave for her <u>own</u> medical condition, not to care for the
22 condition of another.  The key statutory provision -- "caring
23 for" -- was not implicated in *Jennings* at all.  The key question
24 in this case is whether Boecken's walks, taken during his FMLA
25 leave, constituted "caring for" his grandmother.  It is
26 undisputed that Boecken took the walks for his own purposes and
27 was not in contact with his grandmother during the walks.  He did
28 not take FMLA leave for his own medical needs.  Any "care" was

1  for himself.  As in *Tellis*, "common sense" suggests that

2  Boecken's walks do not qualify as "caring for" his grandmother.

3  Accordingly, Gallo's decision to terminate him for engaging in

4  non-covered activities during his FMLA leave did not constitute

5  interference with Boecken's FMLA rights.  Gallo's motion for

6  summary judgment on the FMLA interference claim is therefore

7  GRANTED.  Boecken's cross-motion is DENIED.[5]

8                    b.    Notice Claim.

9       Boecken also claims that Gallo violated FMLA by failing to

10  explain to him that his conduct, namely taking a walk in the park

11  after work and running errands, was not covered by FMLA.  Gallo

12  correctly asserts that it has no obligation to provide such

13  detailed notice to its employees.  Rather, the regulations

14  require employers to notify employees generally of their rights

15  and obligations under FMLA.  29 C.F.R. § 825.301.  Section

16  825.301 provides that the notice must include, as appropriate:

17              (I) that the leave will be counted against the
                employee's annual FMLA leave entitlement (see §
18              825.208);

19              (ii) any requirements for the employee to furnish
                medical certification of a serious health condition and
20              the consequences of failing to do so (see § 825.305);

21              (iii) the employee's right to substitute paid leave and
                whether the employer will require the substitution of
22              paid leave, and the conditions related to any
                substitution;
23
                (iv) any requirement for the employee to make any
24              premium payments to maintain health benefits and the
                arrangements for making such payments (see § 825.210),
25

26       [5]    This also disposes of Boecken's motion for summary

27  adjudication of Gallo's "affirmative defense" that it had a
    legitimate, non-discriminatory basis for terminating him.
28  Plaintiff's motion is DENIED.

                              21

1

2

and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

3

4

(v) any requirement for the employee to present a fitness-for-duty certificate to be restored to employment (see § 825.310);

5

6

7

(vi) the employee's status as a "key employee" and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial (see § 825.218);

8

9

(vii) the employee's right to restoration to the same or an equivalent job upon return from leave (see §§ 825.214 and 825.604); and,

10

11

12

(viii) the employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave (see § 825.213).

13

14

15

16

17

(2) The specific notice may include other information-- e.g., whether the employer will require periodic reports of the employee's status and intent to return to work, but is not required to do so. A prototype notice is contained in Appendix D of this part, or may be obtained from local offices of the Department of Labor's Wage and Hour Division, which employers may adapt for their use to meet these specific notice requirements.

18

19

20

21

It is undisputed that Gallo provided general notice to Boecken by displaying its FMLA policies and by giving Boecken the Certification form, the Notice of Associate Rights and Responsibilities, and the approval notice.

22

23

24

25

26

27

28

Boecken's assertion that Gallo was required to provide him with more specific notice as to the lawfulness of his conduct is not supported by any legal authority.  Boecken's citation to *Bachelder*, 259 F.3d 1112, is inapposite.  In that case, the Ninth Circuit held that an employer is responsible for telling employees which of the four Department of Labor-approved methods it has selected for tracking the twelve-month period that

determines when each employee's twelve weeks of leave has been
used up.  *Id*. at 1129.  In so holding, the *Bachelder* court
acknowledged that "FMLA's implementing regulations do not
expressly embody a requirement that employers inform their
employees of their chosen method for calculating leave
eligibility."  *Id*. at 1127.  However, after reviewing the
regulations as a whole, the Ninth Circuit concluded that "[t]he
regulations nonetheless plainly contemplate that the employer's
selection of one of the four calculation methods will be an open
one, not a secret kept from the employees, the affected
individuals."  *Id*.  The *Bachelder* court further reasoned "[t]hat
the Labor Department so understood its own regulations is
confirmed by the Department's statement, when announcing the
regulations, that '[e]mployers must inform employees of the
applicable method for determining FMLA leave entitlement when
informing employees of their FMLA rights.' 60 Fed. Reg. at
2,200."  *Id*. at 1128.

     Boecken points to no provision in the regulations or the
statute that implies a requirement that Gallo notify employees of
specific conduct that is and is not covered by FMLA.  *See also*
*McDaneld v. E. Muni. Water Dist. Bd.*, 109 Cal. App. 4th 702
(2003)(rejecting argument that it was employer's responsibility
to notify employee that he could not play golf and work in his
yard during family leave).

     Gallo's motion for summary judgment on Boecken's notice

1   claim is GRANTED.[6]  Boecken's cross-motion on this issue is
2   DENIED.

3          4.   CFRA Analysis.

4       Unlike claims under FMLA, CFRA claims are evaluated
5   according to the so-called *McDonnell Douglas* burden shifting
6   analysis.  *Nelson,* 74 Cal. App. 4th at 613.

7       In *Guz v. Bechtel Nat. Inc*.  24 Cal. 4th 317, 354 (2000),
8   the California Supreme Court summarizes the application of the
9   *McDonnel Douglass* test.

10              At trial, the McDonnell Douglas test places on the
11              plaintiff the initial burden to establish a prima facie
                case of discrimination. This step is designed to
                eliminate at the outset the most patently meritless
12              claims, as where the plaintiff is not a member of the
                protected class or was clearly unqualified, or where
13              the job he sought was withdrawn and never filled. While
                the plaintiff's prima facie burden is "not onerous", he
14              must at least show " 'actions taken by the employer
                from which one can infer, if such actions remain
15              unexplained, that it is more likely than not that such
                actions were "based on a [prohibited] discriminatory
16              criterion...."

17              The specific elements of a prima facie case may vary
                depending on the particular facts. Generally, the
18              plaintiff must provide evidence that (1) he was a
                member of a protected class, (2) he was qualified for
19              the position he sought or was performing competently in
                the position he held, (3) he suffered an adverse
20              employment action, such as termination, demotion, or
                denial of an available job, and (4) some other
21              circumstance suggests discriminatory motive.

22              If, at trial, the plaintiff establishes a prima facie
                case, a presumption of discrimination arises.  This
23              presumption, though "rebuttable," is "legally
                mandatory." Thus, in a trial, "[i]f the trier of fact
24              believes the plaintiff's evidence, and if the employer
                is silent in the face of the presumption, the court
25              must enter judgment for the plaintiff because no issue
                of fact remains in the case."
26

27      _____
           [6]    As a result of this conclusion, it is not necessary to
28   discuss Gallo's alternative argument about lack of prejudice.

                                    24

1
2
3
4

> Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to "raise a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason.

5
6
7
8
9

> If the employer sustains this burden, the presumption of discrimination disappears. The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff.

10
11

*Id.* (internal citations omitted).

12
13
14

The *Guz* court clarified how the *McDonnell Douglas* formula should apply, under California law, to an employer's motion for summary judgment against a claim of prohibited discrimination.

15
16
17

An employer may either demonstrate that the employee cannot demonstrate one of the elements of his prima facie case, or may, alternatively, demonstrate that he was terminated for a

18
19
20
21

legitimate, non-discriminatory reason.  *Id.* at 356-57.  If, under the second scenario, the employer's nondiscriminatory reason is "creditable on its face," the burden shifts to the employee to "point[] to evidence which nonetheless raises a rational

22
23

inference that intentional discrimination occurred."  *Id.* at 357.

24
25
26

Here, Gallo satisfies the latter requirement, having submitted evidence that, if believed, shows Boecken was fired for misusing his FMLA leave.  The question then becomes whether the employee's evidence raises a triable issue of fact regarding

27

pretext.

28

1
2
3

> A nonmoving plaintiff may show pretext either
> indirectly by demonstrating that the employer's stated
> reasons for its adverse action were not credible, or
> directly by establishing that the employment decision
> was more likely motivated by a discriminatory reason.

4   *Nelson*, 74 Cal. App. 4th at 613  (internal citations and

5   quotations omitted).

6      Here, the only evidence Boecken presents to support of the

7   existence of pretext in the context of FMLA is the affidavit of

8   Mark Reyna, a former Gallo employee who claims he was unfairly

9   terminated for FMLA misuse.[7]  (Exhibit D. to Plaintiff's

10  Statement of Evidence in Opposition, Doc. 43-9 at 6-9.)[8]  Mr.

11  Reyna makes two potentially pertinent assertions.  First, he

12  _____

13
14
15
16
17
18

     [7]    Boecken also cites the deposition of Sandra Duvall in
support of his assertion that the Human Resources department at
Gallo "has in the past discouraged employees from exercising
their rights under FMLA."  But, Gallo correctly points out that
the cited testimony, Duvall Depo. at 42:18-43:12, does not
support this assertion.  Duvall testified that she has on several
occasions counseled employees that they could not use leave time
granted to care for relatives to go to the store to purchase
items other than medication.

19
20
21

     [8]    Mr. Reyna also claims to have witnessed other employees
being terminated unfairly for FMLA misuse.  Any evidence Reyna
presents concerning the treatment of individuals other than
himself is hearsay; he may only attest to events of which he has
personal knowledge

22
23
24
25
26
27
28

     Gallo also objects generally to the introduction of Reyna's
affidavit on the ground that he was never identified by Boecken
during discovery and Gallo never had a chance to depose him.
Gallo requests that the declaration be excluded on the ground
that Boecken violated his duty to seasonably supplement his
initial disclosures and prior discovery responses with respect to
this witness.  Alternatively, Gallo requests that decision on
summary judgment be continued so that Gallo can have an
opportunity to depose Mr. Reyna.  Because, even assuming the
admissibility of this evidence, Boecken's claims fail, it is not
necessary to address Gallo's objection.

1  claims that in 2002, April Tharpe spoke to Reyna and a group of

2  other Gallo employees and emphasized that Gallo was "cracking

3  down" on the "misuse" of FMLA by employees.  Reyna Aff., at ¶7.

4  Reyna understood this to be a "threat by Gallo that employees

5  should not be using FMLA even if they were entitled to do so."

6  (*Id.*)

7          Reyna also asserts that he was wrongfully terminated for

8  FMLA fraud.  He describes the circumstances as follows.  His wife

9  was diagnosed with colon cancer in August 2005, which required

10 extensive medical care.  Mr. Reyna provided her with extensive

11 assistance, including performing household chores, and helping to

12 administer and monitor her chemotherapy treatments.  *Id.* at ¶8.

13 As a result of providing this assistance, Mr. Reyna was exhausted

14 when he arrived at work.  On August 14, 2006, he asked his

15 supervisor for time off work.  The request was denied.  *Id.* at

16 ¶9.  Mr. Reyna explained that he was suffering from back pain

17 because of the "air bag" work he was assigned to perform, as

18 opposed to his old work as a fork lift driver, and asked to be

19 reassigned to a different task.  This request was denied.  *Id.* at

20 10.  On August 21, 2006, Mr. Reyna told his supervisor he needed

21 to take time off because he had been working for seven days

22 straight, got off at 8:00 a.m. on Sunday and was exhausted

23 because he had been helping around the house.  Reyna also

24 complained that he was tired and overworked as a result of being

25 assigned to doing air bag work and asserted it was unsafe for him

26 to keep working.  His requests were denied.  *Id.* at ¶11.

27 Finally, at 3:30 a.m., Mr. Reyna told his supervisor he was

28 "going home and using FMLA leave time."  *Id.*  His supervisor did

not say this was improper. *Id*. He was subsequently informed by
Tharpe that Gallo had placed under investigation for FMLA fraud.
*Id*. at 12. Although Mr. Reyna does not explicitly state the
basis for his termination, it is implied that he was terminated
for FMLA fraud. *Id*.

Although, under certain circumstances, evidence of a pattern
of other, similar discharges might establish pretext, is not at
all clear why Gallo's termination of Mr. Reyna, who was believed
to also be misusing FMLA leave, but under totally different
circumstances, provides any reason to believe pretext was at work
in this case. *See Mundy v. Household Finance Corp.*, 885 F.2d
542, 546 (9th Cir. 1989)(finding that the dismissal of six other
employees over the age of 40 did not, on its own, establish a
pattern and practice of age discrimination, as plaintiff offered
no evidence that the terminations were without good cause or that
age was a determining factor). Here, there is no evidence to
suggest that Mr. Reyna's termination was without good cause. For
example, Mr. Reyna fails to supply critical foundational
evidence, including evidence establishing that he submitted a
FMLA certification and was approved for FMLA leave by Gallo prior
to walking off the job on August 21, 2006.[9]

Gallo's motion for summary judgment on the CFRA claim is
GRANTED. Boecken's cross motion for summary judgment on this
issue is DENIED.

---

[9]   Mr. Reyna's assertion that Tharpe's warning that Gallo
was "cracking down" on FMLA fraud was meant to intimidate
employees from using FMLA is inapposite here, as Boecken was
clearly not intimidated from attempting to use FMLA leave.

B. **Perceived Sexual Orientation Discrimination**.

Boecken asserts that Gallo discriminated against him when it used Boecken's perceived homosexuality as a factor in his FMLA investigation and subsequent termination.

Under FEHA, "[i]t is unlawful ... [f]or an employer, because of ... sexual orientation ... to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."  Cal. Gov't Code § 12940(a).  Sexual orientation discrimination "includes a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those  characteristics."  § 12926(m).

Because of the similarity between FEHA and federal employment discrimination laws, California courts look to pertinent federal precedent when applying FEHA and applies the *McDonnell Douglas* burden shifting described above.  *See Guz,* 24 Cal.4th at 354 .  Here, Gallo first attempts to show that Boecken cannot demonstrate the first element of a prima facie case: that decision-makers perceived him to be homosexual or bisexual.  *See* Cal. Gov. Code § 12926(m).  Gallo contends no evidence exists that any person making a decision adversely affecting Boecken perceived him to be homosexual.  In support of this position, Gallo asserts that Tharpe knew Boecken and Sweetin were friends, but had no reason to believe he was homosexual or bisexual.

29

1   However, Tharpe testified at her deposition that although she

2   never "heard a rumor" that Boecken and Sweeten were homosexuals,

3   she did state that she "heard people, couple of the other union

4   hourly employees would say, 'Oh, they're hanging out a lot,'

5   wink, wink, nod, nod.  They'd wink and nod, and I would just

6   ignore it."  Tharpe Depo. at 15:17-20.

7        Gallo also maintains that neither of the two individuals

8   responsible for terminating Boecken, Reed and Bates, had reason

9   to believe Boecken was homosexual or bisexual.  Bates in fact

10  stated that she had no suspicion that Boecken was a homosexual.

11  However, the investigator's report concerning Boecken's

12  activities on October 29, might insinuate that Boecken and

13  Sweetin were engaged in homosexual conduct.  For example, the

14  Report indicates that at 2:08 p.m. the "videotape shows the

15  subject driving out of the small parking lot toward a large dirt

16  area across the street, near three school buses.  Continuing

17  videotape shows the subject and his unidentified male companion

18  walking toward a wooded area and out of view."  The next entry in

19  the Report indicates that at 2:14 p.m. "[w]e located the subject

20  and his companion in the wooded area, inside a makeshift sleeping

21  area that had four walls and blankets.  We observed the

22  [Boecken's] head pop up as he heard our presence and quickly put

23  his head down.  We then observed his male friend's head pop up

24  quickly and then put his head down."  The Report further

25  indicates that a few minutes later, Boecken and Sweetin were seen

26  walking away from the sleeping area and towards their vehicles.

27  Bates and Reed were privy to the report.  Gallo maintains that

28  neither Bates nor Reed read anything into the investigation

1  report, but viewing the evidence in a light most favorable to
2  Plaintiffs, Bates and Reed had reason to perceive Boecken to be a
3  member of a protected class.

4      Alternatively, Gallo has presented a legitimate basis for
5  Boecken's termination.  The question then becomes whether Boecken
6  has presented any evidence tending to show that his termination
7  for FMLA misuse was a pretext for discrimination on account of
8  his perceived sexual orientation.  To satisfy his burden,
9  Plaintiff must present "evidence supporting a rational inference
10 that intentional discrimination, on grounds prohibited by the
11 statute, was the true cause of the employer's actions." *Guz*, 24
12 Cal. 4th at 361 (*citing Hicks v. St Mary's Honor Ctr.*, 509 U.S.
13 502, 510-20 (1993)); *see also Nelson*, 74 Cal. App. 4th at 613 ("A
14 nonmoving plaintiff may show pretext either indirectly by
15 demonstrating that the employer's stated reasons for its adverse
16 action were not credible, or directly by establishing that the
17 employment decision was more likely motivated by a discriminatory
18 reason.").

19     The only evidence that comes anywhere close to demonstrating
20 pretext concerns the reasons for Thorpe's "suspicions" about
21 Boecken's use of FMLA leave, which she communicated to Reed.  It
22 is undisputed that Thorpe heard rumors that Boecken and Sweetin
23 were romantically involved.[10]  It is also undisputed that Boecken

24

25     [10]  Sweetin' stated that he recalled "a female employee at
26 Gallo approaching [him] some time after October 29, 2003, who
   strangely questioned [him] about [his] sexuality and said there
27 was a surveillance tape of [him] and Larry Boecken walking in the
   park."  Sweetin Aff., Doc. 43-9, at ¶9.  Gallo points out that
28 this statement stands in complete contradiction to his prior

1  used FMLA leave more than 20 times before he was placed under

2  investigation.  The stated reason for initiating the

3  investigation of Boecken was Thorpe's suspicion that Boecken was

4  leaving work to spend time with Sweetin, a man with whom it was

5  rumored Boecken had a romantic relationship.  Viewed in the light

6  most favorable to Plaintiff, the evidence also suggests that Reed

7  and Bates, the individuals who made the decision to terminate

8  Boecken, had some reason to suspect that Boecken might be

9  romantically involved with Sweetin.  However, there is absolutely

10 no evidence to support an inference that Reed and Bates

11 terminated Boecken <u>because of</u> any perception they might have had

12 about his sexual orientation.  He was observed to be engaged in

13 recreational activities in a park while he was on FMLA leave to

14 care for his grandmother.  Boecken has not demonstrated that

15 Gallo's stated reasons for terminating him were not genuine and

16 lawful, nor has he in any way "establish[ed] that the employment

17 decision was more likely motivated by a discriminatory reason."

18 *See Nelson*, 74 Cal. App. 4th at 613.

19     Gallo's motion for summary judgment on the FEHA claim is

20 GRANTED.  Plaintiff's cross-motion is DENIED.

21

22 ───────────────────

23 deposition testimony, *see objections*, Doc. 50 at 12-13.  Gallo
   argues that the affidavit should be disregarded as a "sham"

24 created only to avoid summary judgment.  *See Kennedy v. Allied
   Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).  As explained

25 in greater detail in the accompanying evidentiary rulings,
   Gallo's motion is GRANTED and this statement by Sweetin is deemed

26 inadmissible.  Even if it was admissible, it would not have
   shifted the analysis, as it only lends support to the undisputed

27 fact, as admitted by Thorpe, that there were rumors at Gallo

28 regarding Boecken and Sweetin's sexual orientation.

1        **C.    Termination in Violation of Public Policy**.

2        Boecken's third claim for relief is termination in violation

3   of public policy.  Specifically, Boecken asserts Gallo terminated

4   him in violation of FMLA/CFRA and FEHA, which are the underlying

5   foundations of his public policy claim.  At the hearing on these

6   motions, the parties agreed that Boecken's public policy claim is

7   subsumed within his the FMLA/CFRA and FEHA claims.  Accordingly,

8   the parties agreed that the public policy claims rise and fall

9   with the other claim in this case.  Gallo's motion for summary

10  judgment on this claim is GRANTED.  Plaintiff's motion for

11  summary judgment is DENIED.

12

13                      **V.   Conclusion**.

14       For the reasons set forth above, Gallo's motion for summary

15  judgment is GRANTED, and Boecken's motion for summary judgment is

16  DENIED.

17       Defendant shall submit a form of judgment consistent with

18  this decision within five days following the date of service of

19  this decision.

20

21  SO ORDERED

22  DATED:   September 30, 2008

23

24                         **/s/ Oliver W. Wanger**
                              **Oliver W. Wanger**
25                       **United States District Judge**

26

27

28

                            33